### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO.  07-00040 |
| | : | |
| JOHN JACKEY WORMAN | : | |

### M E M O R A N D U M

STENGEL, J.                                                    September 4, 2008

On July 24, 2008, a federal grand jury returned a superceding indictment charging John Jackey Worman with fifty-five counts of using a minor to produce visual depictions of sexually explicit conduct in violation of Title 18 of the United States Code, Sections 2251(a) and (e), and one count of possession of child pornography in violation of Title 18 of the United States Code, Section 2252(a)(4).  Worman filed a motion to suppress physical evidence.  The government has responded.  For the following reasons, I will deny the motion in its entirety.

When erotic photographs of her naked twelve-year-old brother were found on the family computer, "Chr.B," the daughter of one of Worman's co-defendants, decided to come forward to inform the authorities at the Delaware County District Attorney's Office that Worman had sexually abused her while she was between the ages of ten and fifteen years, i.e., from 1997 through 2002.  These acts of abuse allegedly occurred while Chr.B lived at Worman's home on 103 Walnut Street in Colwyn with Worman and Prawdzik, her mother.  The photographs of her brother caused her to be concerned that her brother and sister could also have been sexually abused by Worman.  Chr.B told the detectives

that Worman had also taken nude photographs of her, that Worman had videotaped sexual

activity with her, and that Worman told her that he scanned the pictures and tapes onto his

computer.  In her handwritten statement, Chr.B declared:

> When [Worman] started the sex he started to videotape me
> and then he said he skans [sic] the video on a disk and saves it
> into the computer at 103 Walnut Street.  Everything happened
> in his room.  He told me that no one would ever get it.  When
> he dies, he'll tell me the password and only I will see the good
> times we had.
>
> * * *
>
> [Worman] referred to sex as another name; he calls it a "turn."
> Ever since then he kicked me out.  I moved in with my
> [grandmother] in Drexel Hill and never saw [Worman] again.
> When I would call for Father's Day, he would always ask for
> a turn.
>
> * * *
>
> [Worman] also had small mini cameras around the house and
> one was on my brother every night.

See Gov. Ex. 2.  In response to these accusations, Detective Sergeant John Kelly of the

Criminal Investigation Unit of the Delaware County District Attorney's Office set up two

consensual tape-recorded conversations between Chr.B and Worman.  Detective Kelly

then prepared an application for search warrant of Worman's residence, which was

approved on February 3, 2006, by the Honorable Edward J. Gannon, a Magisterial

District Judge in Sharon Hill, Pennsylvania.

The initial search of Worman's home was conducted that same day.  The items

seized included computers, hard drives, compact discs, videos, photographs and a camera.

Based on this evidence, Detective Kelly prepared a second search warrant application for

co-defendant Jackson's home.[1]  The search of Jackson's home was conducted on

February 9, 2006.  These two searches yielded enough information for Detective Kelly to

obtain a warrant for Worman's arrest.  Worman fled and became a fugitive after learning

about the warrant for his arrest.  When deputies of the United States Marshals Service

apprehended and arrested him on February 27, 2006, Worman was in the process of

destroying a hard drive and a number of compact discs which had been broken into

pieces.  Worman was taken to Judge Gannon's office for a preliminary hearing and bail

was set at one million dollars cash.

On April 5, 2006, Detective Kelly submitted an application for a second search

warrant of Worman's home in order to obtain a chair and a car-seat which were seized the

next day during the search.  Detective Kelly learned about these two items as a result of

the initial search on February 3, 2006.  Then, on April 26, 2006, Detective Kelly

completed his final application for a search warrant to search and seize a computer owned

by Worman and found by Jackson at her home.  The charges against Worman and his co-

defendants arise out of these four searches.

On February 6, 2008, Worman filed a motion to suppress the physical evidence

seized during those searches challenging them as unlawful.  A couple of weeks later, he

supplemented that motion and requested *ex parte* a hearing pursuant to <u>Franks v.</u>

---

[1]  Worman argues that because none of the allegations made by Chr.B provided a nexus between the alleged sexual abuse and Jackson's home, Detective Kelly included information he obtained based on a result of the initial search.  This contention forms the basis of his "fruit of the poisonous tree" argument.

Delaware, 438 U.S. 154 (1978).  In Franks, the Supreme Court held that where a

defendant showed by a preponderance of the evidence that a false statement necessary for

the finding of probable cause was made "knowingly and intentionally, or with reckless

disregard for the truth," evidence obtained as a result of the warrant must be excluded.

Id. at 155-56.  The government vigorously opposed this tactic and filed a motion of its

own seeking the denial of Worman's proposed plan of seeking *ex parte* consideration of

his request for a Franks hearing.  I granted the government's motion and denied

Worman's request and ordered him to file his supplemental memorandum and serve the

government with a copy.  The government responded.

The Supreme Court established the following procedure for challenging a search

warrant affidavit that is alleged to contain materially false statements:

> [W]here a defendant makes a substantial preliminary showing
> that a false statement knowingly and intentionally, or with
> reckless disregard for the truth, was included by the affiant in
> the warrant affidavit, and if the allegedly false statement is
> necessary to the finding of probably cause, the Fourth
> Amendment requires that a hearing be held at the defendant's
> request.  In the event that at that hearing the allegation of
> perjury or reckless disregard is established by the defendant
> by a preponderance of the evidence, and, with the affidavit's
> false material set to one side, the affidavit's remaining content
> is insufficient to establish probable cause, the search warrant
> must be voided and the fruits of the search excluded to the
> same extent as if probable cause was lacking on the face of
> the affidavit.

Id. at 155-56.

On May 19, 2008, after hearing brief argument on the Franks issue, I was still not

4

convinced that the defendant had proven that he was entitled to a <u>Franks</u> hearing.  I

determined, however, that in an abundance of caution a <u>Franks</u> hearing might at the very

least be helpful to the record, and asked counsel to proceed accordingly with the hearing.

<u>See</u> N.T. 5/19/08 at 13.  The only witness called was Detective Kelly.  Detective Kelly

was the affiant on all four search warrant applications in this case.  During the hearing,

counsel for Worman requested copies of a spreadsheet maintained by Detective Kelly

involving all child abuse cases investigated by his office, and the list of the names of

cases involving child pornography and computers in which Detective Kelly served as the

affiant.  I ordered the government to produce those documents which it did on June 11,

2008.

On July 24, 2008, I conducted a second hearing on the motion where counsel for

Worman, apparently not satisfied with what he had requested at the initial hearing,

requested the affidavits supporting the cases on the list provided by Detective Kelly.

Again, I ordered the government to comply with this request which it did on July 29,

2008.  Worman then filed a second supplemental memorandum in support of his motion

to suppress.  The government has responded.

Worman relies on the following two basic arguments for suppression: 1) the

evidence gathered from the first search was obtained through an invalid search warrant

issued in reliance on stale information; and 2) the evidence gathered as a result of the

subsequent searches is the fruit of the first unlawful search.  Worman argues that

Detective Kelly misrepresented the expert opinion of Kenneth V. Lanning in an effort to overcome the issue of staleness, that he deliberately omitted material information, and that the detective misrepresented the extent of his own experience in cases involving child pornography and computers.  These misrepresentations and omissions, Worman insists, preclude finding the affidavit for probable cause sufficient to justify the initial search.

The Third Circuit held that Franks also applies to cases where it is alleged that facts have been deliberately or recklessly omitted from a search warrant affidavit.  United States v. Frost, 999 F.2d 737, 742-43 (3d Cir. 1993).  In this context, "(1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting."  Wilson v. Russo, 212 F.3d 781, 783 (3d Cir. 2000).

Once a court finds that facts have been recklessly omitted from a search warrant application, the court must determine whether the omissions were material, or necessary to the finding of probable cause.  This is because, even where there is an omission from an affidavit, the affidavit may nonetheless support a valid warrant if, when the omitted information is included in the affidavit, it still provides probable cause to search.  Frost, 999 F.2d at 743.  "To determine the materiality of the misstatements and omissions, we excise the offending inaccuracies and insert the facts recklessly omitted, and then

6

determine whether or not the 'corrected' warrant affidavit would establish probable cause." Wilson, 212 F.3d at 789.  In so doing, the Third Circuit has instructed courts to read the affidavit in its entirety in a common sense, non-technical manner, focusing on what the affidavit includes, rather than on what it does not include.  United States v. Williams, 124 F.3d 411, 420 (3d Cir. 1997); United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993).

In Wilson, an officer omitted a witness' description of the defendant's height that was significantly different from the height indicated in the warrant affidavit.  212 F.3d at 785.  The officer also omitted the fact that one witness failed to identify the defendant out of a photo lineup, only stating that another witness had "unequivocally" done so.  Id.  The Third Circuit held that omissions are made with reckless disregard for the truth "when an officer recklessly omits facts that any reasonable person would know that a judge would want to know."  Id. at 783.  The inconsistent statements regarding the height of the defendant, and the fact that a witness had not picked him out of an array "were the kinds of things the judge would wish to know."  Id. at 788.

In United States v. Calisto, 838 F.2d 711 (3d Cir. 1988), a state trooper omitted facts from the affidavit to conceal the identities of three law enforcement officers and an informant.  The Third Circuit affirmed the district court's denial of a suppression motion, and noted that the trooper had filed the affidavit in good faith, that any intent to mislead the magistrate judge "was occasioned not by a scheme to deceive the magistrate judge

about a material fact, but by a desire to withhold a fact not material to the magistrate judge's task," and that this information was an unimportant fact in the context of probable cause.  Id. at 714-15.

In United States v. Frost, a detective omitted from the warrant affidavit the fact that, two hours before the warrant to search the suitcase was issued, a drug-sniffing dog failed to alert to the presence of drugs in the suitcase.  999 F.2d at 742-743.  The detective testified that he omitted the information because drug couriers often mask the scent of drugs by packing them with material, such as pepper, and viewed this information as a neutral factor in the context of a probable cause determination.  Id. at 743.  He also testified that, if he had included the omitted information in the affidavit, he would have explained the scent-masking techniques used by drug couriers.  Id.  The affidavit included a substantial amount of other incriminating evidence, however, and the Third Circuit concluded that probable cause would have existed because the inclusion of the omitted information, as well as the detective's explanation of the scent-masking technique, would not have been inconsistent with the "substantial probative thrust" of the other information included in the affidavit.  Id. at 744.

Here, Worman argues that Detective Kelly knowingly and intentionally, or with reckless disregard for the truth, included false statements and/or omitted material information from the affidavits which were essential to the judicial officer's finding of probable cause.  Worman alleges that his alleged conduct against Chr.B ceased three

8

years before Detective Kelly wrote the original affidavit for the search of 103 Walnut Street.  Rather than freshen probable cause with current information and investigation, Detective Kelly allegedly misrepresented and/or omitted material facts in order to mislead the issuing judicial officer into believing the information contained in the affidavit was not fatally stale.[2]  Worman also contends that not only did the affidavit contain stale information, it was further defective because it did not mention whether Chr.B actually saw the pictures or videos on the computer, whether Worman collects child pornography, or even whether Worman sends and/or receives child pornography on the internet. Nevertheless, Worman argues, Detective Kelly stacked inference upon inference and crafted an affidavit of probable cause, concluding that child pornography was present on Worman's computer; that Worman had used the internet to send and/or receive child pornography; and that Worman was a collector of child pornography.  Worman suggests that it was impossible for Detective Kelly to arrive at these conclusions with such stale information regarding alleged sexual abuse which occurred three to eight years earlier.  I disagree.

Generally, when information offered in support of a search warrant application is too old, the information is stale and cannot establish probable cause.  United States v.

---

[2]  For example, Worman argues that Detective Kelly omitted the fact that there had been no contact at all between Worman and Chr.B for at least three years until Chr.B called Worman at Detective Kelly's urging.  This argument is belied by Chr.B's assertion in her handwritten statement that after she left the home to live with her grandmother at age fifteen years, she would call Worman on Father's Day, and "he would always ask for a turn," the code word Worman used for sex according to Chr.B.

Harvey, 2 F.3d 1318, 1322 (3d Cir. 1993).  Age alone, however, does not determine whether information is stale, and courts must examine the nature of the crime and the type of evidence.  Id.  "The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant."  Id. (quoting United States v. Williams, 897 F.2d 1034, 1039 (10th Cir. 1990)). Rather, a court is required to also examine the nature of the crime and the type of evidence.  Id.

The information used by Detective Kelly in his initial affidavit was not stale.  In fact, Detective Kelly had more than sufficient information to conclude that child pornography would still be present on Worman's computer.  Worman told Chr.B that he would keep the password to his computer hidden until his death, and that he would pass it on to Chr.B so that after his death, "only [she] will see the good times [they] had."  See Exhibit 2 at 2.  This information more than substantially supports probable cause to find that such inappropriate photographs and videos would still be found on Worman's computer years after the alleged acts of abuse.  I also note that the combination of Chr.B's allegations of nude photographs of herself and of a recent uncovering of nude photographs of her minor brother who lived with Worman supported the theory of Worman's continuing interest in child pornography, and affirmed the belief that he still possessed it.

Further, in the context of child pornography, courts have recognized that

10

"individuals will protect and retain child pornography for long periods of time because it is illegal and difficult to obtain."  United States v. Zimmerman, 277 F.3d 426, 434 (3d Cir. 2002).  As one district court has noted:

> The observation that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes is supported by common sense and the cases.  Since the materials are illegal to distribute and possess, initial collection is difficult.  Having succeeded in obtaining images, collectors are unlikely to quickly destroy them. Because of their illegality and the imprimatur of severe social stigma such images carry, collectors will want to secret them in secure places, like a private residence.  This proposition is not novel in either state or federal court:  pedophiles, preferential child molesters, and child pornography collectors maintain their materials for significant periods of time.

United States v. Lamb, 945 F. Supp. 441, 460 (N.D.N.Y. 1996); see also United States v. Harvey, 2 F.3d 1318, 1322-23 (3d. Cir. 1993) (information in affidavit deemed not stale where affiant stated that, in his experience, "pedophiles rarely, if ever, dispose of sexually explicit material"); United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993) (warrant containing statement that "pedophiles . . . keep these materials [child pornography] for many months and years, and rarely, if ever, dispose of their collections" upheld);  United States v. Rakowski, 714 F.Supp. 1324, 1331 (D. Vt. 1987) (the court found probable cause because "the affidavit described a continuing offense of receiving child pornography and the enduring utility of that material to their holder").

Further, any claim that the three year delay was hidden from the issuing judicial officer is belied by the affidavit itself, dated February 3, 2006, which states:  "The victim,

11

[Chr.B], DOB 12/28/1987 reported that between the ages of 10 yrs and 15 yrs, while she was living at 103 Walnut St., Colwyn, 19023 [she] was being sexually assaulted by John Jackey Worman, who was also living at that house."  The face of the warrant plainly states that the victim was born in 1987, and that the last instance of sexual abuse occurred when the victim was 15 years of age.  That would place the last instance of abuse within a year's range of December 2002, a little more than three years before the application for the warrant.  Thus, Detective Kelly did not misrepresent the age of the criminal acts, nor the time period that had passed between the last act of sexual abuse and the application for the warrant.

Worman also argues that, in an effort to cure the staleness problem of the information, Detective Kelly deliberately "tricked" Judge Gannon to believe that it was Worman who reached out to Chr.B, rather than informing the judge that Chr.B agreed to participate in recorded conversations with Worman in January 2006.  However, Detective Kelly credibly testified that he deliberately omitted that information for Chr.B's own safety.  Id. at 34-35.  Detective Kelly indicated that before he composed the affidavit for probable cause, Worman had threatened Chr.B during the first recorded telephone call. Id. at 35.

| | |
|---|---|
| CB: | What do you mean what do I want? |
| Worman: | (Inaudible) |
| CB: | You're going to what? |
| Worman: | I'll fuck you up. |
| CB: | What do you mean by that? |
| Worman: | (Inaudible) why you so fucking serious all of a sudden?"  Are you on |

drugs or something?

See Exhibit B at 13.  Even in her handwritten statement, Chr.B said, "Next to part about sex, [Worman] used to beat me out of nowhere," and she described one particular incident of violent physical abuse inflicted upon her by Worman which prompted Chr.B to move out of that house and into the house of her grandmother.  See Exhibit 2 at 2.  In response to her first attempt at telephone contact, Worman left a message on Chr.B's cellphone that he was in the area of her high school.  Detective Kelly was concerned that Worman was in the area looking for Chr.B.  Accordingly, the detective did not want Worman to know that Chr.B had come forward and agreed to make the consensual telephone calls.  Had Detective Kelly included this information in the affidavit, Worman would have certainly found out because a copy of the warrant including the affidavit would have been left at Worman's residence after the search.  Detective Kelly properly determined that for Chr.B's safety and for the sake of the ongoing investigation, he would omit any information which would have alerted Worman to Chr.B's cooperation.

Detective Kelly also informed in the affidavit that Chr.B had attempted to talk about these incidents with Worman during their recent telephone conversations, but that Worman resisted, claiming that he did not want to talk about that on the telephone. Worman insists that this was a misstatement, and that he did not repeatedly say that he did not want to talk about the alleged incidents.  A careful review of the transcripts as a whole, however, belies his argument.  The following excerpts support the accuracy of the

detective's affidavit describing the evasiveness of the defendant:

| | |
|---|---|
| Worman: | Hold up, Chris.  All of a sudden out of the blue we get a phone call with your questions and shit? |
| CB: | I'm just asking you.  Well? |
| Worman: | Look, is this being recorded? |

See Exhibit B at 7.

| | |
|---|---|
| Worman: | What are you tripping or something? |
| CB: | No.  I'm asking you a question.  That's what I'm doing. |
| Worman: | I told you I love you. |
| CB: | Okay.  That's still not answering my question. |

See Exhibit B at 14.

| | |
|---|---|
| CB: | You're a parent, I'm a daughter, treat me like a daughter. |
| Worman: | Where you at? |
| CB: | I'm at school. |
| Worman: | And you're having this conversation at school? |

See Exhibit C at 8.

| | |
|---|---|
| CB: | So why did you start it up though?  Why was it started up for what, knowing me later on throughout my years, I'm going to think about it and wonder why and it's going to hurt me, why? |
| Worman: | Why? |
| CB: | Why. |
| Worman: | What? |
| CB: | Why did you start it up? |
| Worman: | Well, you know what, maybe we need to sit down and have a talk, but we ain't going to have this shit like this. |
| CB: | Why? |
| Worman: | We ain't going to have this shit like this. |
| CB: | Why?  I'm asking a question. |
| Worman: | Why? |
| CB: | It seems like you can't even answer me, I want to know why, I want, I mean, I've been thinking about it lately. |
| Worman: | Not, not, not, not over the phone we're not. |
| CB: | Why? |

14

| Worman: | Not over the phone we're not. |
|---|---|
| CB: | Why can't we do it over the phone? |
| Worman: | Cause I don't like phones. |

See Exhibit C at 9-10.

| CB: | So I mean, this is the thing, I'm just going to ask you anyway. |
|---|---|
| Worman: | Well not over the phone, don't. |
| CB: | Why? |
| Worman: | Cause it's the phone, Chris. |
| CB: | I'm the only person here. |
| Worman: | Well it doesn't matter who's there, alright, I don't play that, if you want to play that, I'm going to think something's up with you, that something's up with you. |

See Exhibit C at 18.

| CB: | Okay, so I'm asking you a question. |
|---|---|
| Worman: | So if you want a straight up fucking answer, don't ask me on the phone, please, I don't really know what the fuck you're talking about. |

See Exhibit C at 18-19.

| CB: | Alright, what are you paranoid or something? |
|---|---|
| Worman: | I got to pat you down for a wire or what? |

See Exhibit C at 19.

| CB: | Who was the one who started the whole thing up? |
|---|---|
| Worman: | Excuse me.  I can't hear you, this phone's breaking up. |

See Exhibit C at 21.

These examples support Detective Kelly's statements in the affidavit that Worman repeatedly and directly refused to answer any questions about the alleged abuse on the telephone.  These statements were in no way misleading.  Furthermore, in his memoranda

supporting his motion to suppress, Worman chose not to include other comments that he

made to Chr.B during the recorded conversations which, if included in the affidavit,

would have bolstered probable cause that he had sexually molested her:

CB:       Okay, that's why I'm asking this weekend.  But [you] know me, I
          can't get down here, so you would have to come and get me.
Worman:   I'd love to come and get you.  You're 18, ain't you?

See Exhibit B at 16.

Worman:   Um, well now Chris, how do I approach you, huh?
CB:       Saying "Hi."
Worman:   Alright "Hi."
CB:       (laughing).  Okay.
Worman:   Wait a minute, hi, that's not hot, I don't like that way, that sucks.

See Exhibit C at 3.

CB:       So I'm really trying to forget that stuff, cause I didn't like none of it.
Worman:   Oh, oh.
CB:       It's not something, okay, you're supposed to be the dad, I'm
          supposed to be the daughter, remember?
Worman:   Well technically that's not even true.

See Exhibit C at 7.

CB:       And you said you would come down and pick me up only if I gave
          you a turn.  That's not some reason...
Worman:   Chris, hey, yo, you know, it's like sitting in front of a nice fucking
          apple pie, and you want a piece real bad and you can't have it, you
          know, and all you're going to do is aggravate the guy.

See Exhibit C at 8-9.

The defendant's sexually suggestive comments to Chr.B throughout these

conversations corroborate the victim's statements of inappropriate behavior, and further

16

support Detective Kelly's affidavit of probable cause.  If Detective Kelly included these

comments in his affidavit, Worman would have been put on notice of Chr.B's

cooperation when he read the search warrant application and affidavit.  Again, for

Chr.B's safety and for the sake of the ongoing investigation, the detective properly

omitted this information from the affidavit.

Worman also argues that Detective Kelly deliberately omitted from the affidavit

exculpatory statements made by Worman to Chr.B that the only videos he had of her were

videos of family events and vacations:

| | |
|---|---|
| CB: | Uh huh.  You still have any videos of you and me? |
| Worman: | Just family videos I guess. |
| CB: | That's all you have? |
| Worman: | What the hell you talking about? |
| CB: | No, I was just asking you if you still [had] any videos of just you and me? |
| Worman: | I don't remember any videos of just you and me.  Don't go acting weird on [me] now. |
| CB: | I'm not, I [am] just asking a simple question, you gave me a simple answer, so okay. |

See Exhibit C at 33.

Worman also told Chr.B that the only pictures he had of her were school pictures

and Christmas pictures.  When Chr.B asked if Worman still slept in the basement,[3] he

answered that he did not because it was "all cleaned out:"

| | |
|---|---|
| Worman: | It's cleaned out, it's all cleaned out, there's nothing down there. |
| CB: | Everything's cleaned out, (Laughing) |

_____

[3]  The basement is where the alleged sexual activity between Worman and Chr.B and the alleged production of visual depictions of that activity took place.  See Exhibit 2 at 2.

| Worman: | (Inaudible) all cleaned out, there's no TV down there, there's no nothing down there, there's nothing at all. |
| CB: | Wait, don't you still have, like, cause I remember she was telling, she was sitting there, watching the videos and everything, do you still have the videos of me, do you still have pictures or anything? |
| Worman: | Sure, I got your old picture book when you were little. |
| CB: | That's it? |
| Worman: | No, I got school pictures, and Christmas pictures. |
| CB: | And that's it? |
| Worman: | That's it. |
| CB: | You don't have any other pictures of anything? |
| Worman: | No, Chris, I don't have any pictures of anything. |

See Exhibit C at 15.

Worman now argues that Detective Kelly deliberately omitted Worman's self-serving statements because they bore directly on whether evidence of his criminal conduct would be found in his residence. However, when asked at the hearing what it was that made him believe that there would still be evidence of videos or photographs found in Worman's house some three years after the incidents, Detective Kelly responded that from his past experience and training, people like Worman do not get rid of their pictures and videotapes. Instead, they use them for self-gratification and fantasies at some later date. See N.T. 5/19/08 at 28. Further, the telephone calls themselves indicated to Detective Kelly that "Worman was not being truthful in regards to some of the things that he would answer in evading the question that the victim was trying to talk to her about – or to him about." Id. Detective Kelly indicated that Worman's evasiveness factored into the detective's opinion that evidence would be found at the residence. Id. For example, the detective testified that Worman told Chr.B, "I don't know what I have, I

18

threw everything away, but I really don't know what I have because there was so much stuff that was downstairs." Id. Worman's evasiveness coupled with his earlier recorded threat and history of physical abuse led Detective Kelly to believe that the things Worman was saying were not truthful. Id. at 29.

Further, if Detective Kelly included Worman's "exculpatory" comments in the affidavit, Worman would have been put on notice of Chr.B's cooperation in the consensual telephone recordings when he read the search warrant application and affidavit. Accordingly, for Chr.B's safety and for the sake of the ongoing investigation, the detective properly omitted this information from the affidavit.

Worman next argues that Detective Kelly omitted material information from the expert opinion portion of the affidavit. Detective Kelly quoted Kenneth V. Lanning, an expert in the field of child sexual exploitation, but allegedly omitted portions of Lanning's opinion which were necessary to a proper determination of probable cause.[4]

---

[4] For example, Detective Kelly omitted Lanning's opinion that not all molesters of children collect child pornography. In fact, Lanning made a distinction between preferential-type sex offenders and situational-type sex offenders. A preferential-type sex offender has specific sexual preferences or paraphilias, and are more likely to view, and in general almost always collect, theme pornography related to their sexual preference. A situational-type sex offender victimizing children does not have a true sexual preference for children; they molest them for a wide variety of situational reasons; they are more likely to view adult pornography; and they frequently molest readily available children to whom they have easy access. Situational-type sex offenders do not collect pornography with the high degree of predictability of the preferential-type sex offender. Lanning further opines that the situational sex offender might collect pornography but probably would not save it year after year. Worman argues that Detective Kelly deliberately left out this discussion of the two types of child molesters because he did not want the issuing judicial officer to understand that an offender such as Worman probably would not have saved the pornographic material year after year. Again, the fact that Worman indicated he

(continued...)

Worman alleges that Detective Kelly had enough information about Worman to have concluded that Worman was a situational-type sex offender.  For example, according to the expert's article, preferential-type child molesters seem to prefer boys rather than girls.  Worman incorrectly asserts that at the time of the affidavit, Detective Kelly was aware of only one victim, Chr.B.  Worman argues that Detective Kelly could have inferred from this information that Worman was a situational-type offender, and thus less likely to collect pornography or even keep it year to year.  Detective Kelly was also aware, however, of the strong possibility that Chr.B's twelve-year-old brother was also a victim of Worman's abuse.  Keeping this discussion and information from the issuing judicial officer, Worman insists, made it less likely that the judicial officer would question the existence of incriminating evidence at Worman's house.

Worman's argument is belied by Detective Kelly's testimony at the hearing regarding Lanning's expert opinion.  Detective Kelly testified that he was familiar with the work of Kenneth V. Lanning, a retired FBI agent and author of numerous publications concerning child exploitation, child molesters, and their different characteristics.  N.T. 5/19/08 at 16.  Detective Kelly acknowledged that he was aware of the distinction between preferential-type sex offenders and situational-type sex offenders, but that Lanning's more recent work added a third category of offender which blended the

---

[4](...continued)
would save the pornographic material on his computer until his death severely undercuts Worman's argument regarding his understanding of Lanning's opinion.

characteristics of the initial two categories:

> The original publication that he had, dated 1986, indicated the
> two, the situational and the preferential, then in the 2001 he
> also includes them, but he also added an additional one, a
> continual, which has an overlap.  Instead of being able to say
> this person is a situational and this person is a preferential and
> they don't cross lines, that just cannot be said, you just can't
> put particular ones in particular blocks and that's where they
> stay, because a lot of it overlaps.  So, in 2001, this was also
> included in the classifications of a continuing, which they can
> have overlapping.  And it could be *vice versa*, one could be
> part situational and/or preferential or *vice versa*.  And I
> believe it just goes to the degree of what one is and compared
> to the other one, which goes along with this continuum that he
> came about in 2001 in his publication.

N.T. 5/19/08 at 31.

The Assistant United States Attorney asked Detective Kelly if he was familiar with

the fact that Lanning has said that an offender cannot be classified as either a situational

type offender or a preferential type offender, but that offenders usually have a blend of

characteristics.  Id. at 32.  Detective Kelly responded that he was familiar with that

concept in Lanning's work.

Worman even alleges that Detective Kelly misquoted Lanning on purpose in the

affidavit when he wrote that "no matter how much child pornography the collector has,

often 'he never has enough;' and 'he rarely throws anything away.'"  The actual quote is:

"No matter how much the *preferential sex offender* has, he never has enough.  He rarely

throws anything away."  Another example Worman uses is when Detective Kelly wrote:

"collectors of child pornography swap pornographic photographs the way boys swap

21

baseball cards."  The actual quote is: "Many *preferential sex offenders* swap pornographic images the way boys swap baseball cards."  Worman insists that these omissions are telling in that they support a finding of bad faith or recklessness on Detective Kelly's part. Because Lanning's scholarly work attempts to categorize child sex offenders yet concedes that it would be imprudent to attempt to classify precisely a particular sex offender, I find that Detective Lanning omission of the words "preferential sex offenders" is inconsequential.  This is especially true given the case law described above which supports the detective's allegations regarding the strong tendency of child sex offenders to guard their illicit materials.  That Worman told Chr.B he would keep the material on his computer until his death further underscores the immateriality of the omission.

Another Lanning quote that Worman accuses Detective Kelly of failing to include in the affidavit is that "investigators should not expect to find child pornography or erotica in all or even most cases involving the sexual victimization of children."  Chr.B's handwritten statement again supports the omission of this portion of Lanning's opinion. Chr.B told the detectives that these acts occurred while she lived at Worman's home on 103 Walnut Street with Worman and her mother; that Worman had taken a photograph of her without clothing; that he videotaped the sexual abuse; that Worman told her he scanned the pictures and tapes onto his computer; and that Worman told her that he would guard the photographs and videos on his computer until his death when she would be able to gain access to the photographs and videos to see the good times they had.  Had the

detective included that portion of Lanning's opinion, he would have had to explain why it was immaterial to this case.  Because the affidavit included a substantial amount of other incriminating evidence, probable cause would have still existed because the inclusion of the omitted information and the detective's explanation of why that portion of Lanning's opinion was immaterial to this case, would not have been inconsistent with the "substantial probative thrust" of the other information included in the affidavit.  See United States v. Frost, 999 F.2d at 744.

Even if one would excise the entire paragraph regarding Lanning, pursuant to Franks, 438 U.S. at 171-172, probable cause would still be evident.  The information specific to Worman supplied probable cause that the illicit materials would still be found at Worman's residence:

> The victim also reports that once during the same time period, [Worman] took a still picture of [Chr.B], while she was naked and during the times he was having sex with her, he was videotaping the sexual acts.  He told her that he was putting the pictures [onto the computer] and he then scans the videotaping onto his computer.  The sexual incidents/acts were committed in his room in the basement.

See Affidavit at 1.  Further, this specific information combined with Detective Kelly's forty-one years[5] as a law enforcement officer including fourteen years as a specialist in

---

[5]  Worman attempted to discount Detective Kelly's many years of law enforcement and his particular experience in the area of child sex offenders.  I am not convinced that such a distinguished career can or should be reduced to spreadsheets or lists of related cases for the purpose of questioning the detective's credibility.  Detective Kelly testified that he had attended well over three hundred hours of related training ranging from the initial interviews of the

(continued...)

child abuse cases provided a sufficient basis for the district justice to determine that Worman, like others involved in child pornography, finds intrinsic value in these images, and that for that reason, the images would not be destroyed or deleted.

In light of the disclosures in the affidavit and the information known to Detective Kelly at the time of the application for the warrant, there can be no serious contention that Detective Kelly omitted critical and material facts, let alone that he did so knowingly, intentionally, or recklessly.  See United States v. Singh, 390 F.3d 168, 183-84 (2d Cir. 2004) (denying motion to suppress because no support other than conjecture that case agent was reckless or intentionally omitted a fact in the affidavit); see also United States v. Lebovitz, 506 F. Supp. 249, 250 (W.D. Pa. 1980) (denying motion to suppress because no evidence that errors in the affidavit were made knowingly or intentionally or with reckless disregard for the truth).  Even if the contested statements were included in the affidavit, they would be neutralized by the other information known to Detective Kelly that would also have been included.  Accordingly, Worman failed to establish that the

---

[5](...continued)
victims to the investigation of allegations that were made by the victims in different types of child molestation cases.  He also receives informal ongoing review through the Federal Bureau of Investigation and other written materials.  N.T. 5/19/08 at 14-15.  Detective Kelly estimated that from the time that he joined the Delaware County District Attorney's Office in 1992 until 2000 when he was made the detective in charge of the Child Abuse Unit, he investigated somewhere between fifteen and twenty cases per month.  N.T. 5/19/08 at 16.  Since he was promoted to detective in charge of that Unit, Detective Kelly has been involved either directly or indirectly in approximately 150 to 200 cases per month.  Id. at 17.  I am satisfied that Detective Kelly's years of experience coupled with the training received both in the classroom and on the streets have sufficiently equipped him to conduct investigations properly.

purported omissions were critical to the finding of probable cause.

Finally, Worman's argument that the evidence seized from the subsequent three searches should also be suppressed as the poisonous fruit of the first unlawful search must also fail.  The three search warrant applications were based on information obtained during the initial search.  Because I find that the affidavit associated with the initial application for search warrant was not defective and that the initial search was lawful, Worman's second basis for suppression is baseless.  I will deny the motion to suppress in its entirety.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 07-40** |
| | : | |
| **JOHN JACKEY WORMAN** | : | |

**<u>O R D E R</u>**

**STENGEL, J.**

    **AND NOW,** this   4th   day of September, 2008, upon consideration of the

defendant's motion to suppress physical evidence (Document #71), the government's

response thereto (Document #83), and after hearings on the motion, it is hereby

ORDERED that the motion is DENIED in its entirety.

                BY THE COURT:


                /s/ Lawrence F. Stengel
_____LAWRENCE F. STENGEL, J.